IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW CWIK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 12 C 6238 |
| | ) |
| FIRST STOP HEALTH, LLC, | ) |
| PATRICK SPAIN, KENNETH | ) |
| ANDERSON, and MARIA OPDYCKE, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Andrew Cwik sued First Stop Health, LLC (FSH), Patrick Spain, Kenneth Anderson, and Maria Opdycke under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), and state law. Cwik worked for FSH from December 2012 through March 2015. Spain is FSH's chief executive officer; Anderson was its vice president of client services; and Opdycke is its chief operating officer.

Cwik alleges that the defendants violated the FLSA and state law by misclassifying him as an exempt employee and failing to pay him overtime pay for the hours he worked in excess of forty hours per week. Cwik also alleges that defendants breached an agreement to compensate him by way of an equity interest in FSH, and he has asserted a claim under the Illinois Wage Payment and Collection Act, 820 ILCS 115/14, to recover compensation for the value of the equity interest.

Defendants have moved to compel arbitration of Cwik's claims. They contend

that Cwik's work for FSH was performed under a written independent contractor agreement that he executed in November 2012. That agreement contains a term that states:

> Arbitration. Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in Chicago, IL in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

PX 17.

Cwik objected to defendants' motion. He argued, among other things, that the work that he performed for FSH that is the subject of this lawsuit was not performed under the independent contractor agreement. Rather, Cwik contended, that agreement had been superseded by a later unwritten agreement under which Cwik worked as an employee of FSH, not an independent contractor. Cwik also argued that the November 2012 agreement does not actually require arbitration; that it does not emcompass the claims in this case even if it is the operative agreement; and that arbitration would be cost-prohibitive.

The Court overruled Cwik's argument that arbitration would be cost-prohibitive but determined that there was a genuine dispute over whether there was an agreement to arbitrate that encompassed Cwik's claims in this case. The Court therefore set the matter for trial on that question under 9 U.S.C. § 4. Both sides waived a jury, and a bench trial was held on various dates in January and March 2016. This constitutes the Court's findings of fact and conclusions of law.

The Court begins by emphasizing that the issue before the Court is not whether the work Cwik performed was done as an employee or as an independent contractor.

Rather, the issue is whether the claims he has asserted are subject to the arbitration requirement in the agreement that he executed. There is overlap between these two issues, but they are not coextensive. In other words, it is conceivable that even if Cwik's work was not performed under the independent contractor agreement that he signed, he was nonetheless working for FSH as an independent contractor. And it is also conceivable that even if Cwik's work was performed under the independent contractor agreement that he signed, he was still legally an employee—in other words, he was misclassified by FSH. The Court does not adjudicate the employee-vs.-independent-contractor issue in this decision.

FSH is in the business of "telemedicine." Specifically, it provides a service to employers of making physicians available on a twenty-four-hour, seven-days-per-week basis to employees. A significant part of FSH's services are provided online via its website.

In the fall of 2012, FSH sought applications for the position of project manager, an open position previously held by an individual who worked for FSH as an employee. Cwik applied and interviewed for the position in early November 2012. FSH liked him but decided not to hire him for the project manager position. *See, e.g.,* PX 29A. Rather, FSH told Cwik that it was "interesting in pursuing a consulting contract based arrangement to assist [FSH] in determining a [quality assurance] process" for its website; specifically "to create a full test plan for the FSH site and get [Cwik's] recommendations on what [FSH's] process should look like." PX 7. Cwik inquired what exactly FSH was looking for. FSH replied that it was looking for "a complete regression test plan" for the site, something that would enable FSH to say "that everything works,"

as well as recommendations on the types of quality assurance testing plans the company should put in place for further releases. DX 148.

After providing Cwik with further specifics, *see id.*, FSH asked Cwik on November 13, 2012 to sign an independent contractor agreement. *See* PX 9. Cwik did so, and the agreement was dated that same date. *See* PX 17. This agreement contains the arbitration requirement previously quoted. *Id.* ¶ 15. The agreement also contained an attachment that said this:

### DUTIES, TERM, AND COMPENSATION

> Contractor will be required to provide development and support for the online website properties of FSH LLC, including but not limited to:
> - Development of test cases, suites
> - Execution of QA testing
> - Recommendations for QA processes
>
> The term of the agreement is until terminated by either party.
>
> The compensation will be $40/hour upon verification of hours worked by FSH.

*Id.*, Sched. A.

On November 14, 2012, at FSH's request, Cwik provided an estimate of eighty hours "to create a full regression test suites for the First Stop Health website," which would involve "creating manual test cases covering all functionalities . . . ." PX 11. FSH did not reply to Cwik until a week later, when its technology director Ben McInturff sent Cwik an e-mail dated November 21, 2012, saying this:

> Andrew:
> Sorry for not following up sooner.
>
> We're discussing next steps… and I will follow up with you as soon as I have info.

> To be quite honest, there is concern that we are not capable of maintaining a test plan if we built it, and there is concern about devoting 80 hours to a test plan…
>
> I am going to try to see if we can engage your services in the interim for pre-release testing.
>
> Ben McInturff
> Director of Technology

*Id.*

FSH had no further contact with Cwik until December 4, 2012, when McInturff e-mailed Cwik to ask for a meeting. McInturff said:

> We're thinking that since we have an acute need for a [project manager]/[quality assurance] resource, we'd like to give you a shot on the contract basis, up to 40 hours a week. We'll have to execute a modified IC Agreement… but assume that wouldn't be a problem? You would report to both Ken [Anderson] and myself. Are you still available full time, or have you already taken a role somewhere else?

PX 13. Cwik replied that he was "still available full time," and a meeting was arranged for December 6. *Id.*

Cwik started working for FSH on or about December 6, though no "modified independent contractor" agreement was executed. On January 4, 2013, Anderson told Cwik in an e-mail that FSH appreciated his help "in getting this release rolled out," and that the company "would like to officially extend your contract for another 2 weeks or 80 hours." DX 296.

Cwik testified that he understood that, as of December 2012, he was a full time employee serving as project manager, but he did not testify that any FSH representative told him this. Cwik was told (later) that he would have to submit time sheets, and he did so on a consistent basis. He was told that he would take whatever vacation time he

5

needed, with approval by his manager Ken Anderson. Cwik also submitted regular status reports.

Cwik had, and used, a desk at FSH; he was given an FSH e-mail address; and he was permitted to use the fitness facilities at the building where FSH had its offices. He had a title—actually more than one—as well as FSH business cards, and the company had an organizational chart that identified him as Director (Project Management). FSH identified him to outsiders as the company's project manager. Cwik was permitted, indeed directed, to execute independent contractor agreements with others on FSH's behalf, even though the independent contractor agreement that he had signed in November 2012 stated that he had no authority to bind FSH to any kind of agreement.

In May 2013, Anderson asked FSH's human resources manager Viola Riabo for assistance "in preparing an employment offer for Andy Cwik," saying that he wanted "to onboard [Cwik] 5/31/13 so he can get benefits on 7/1." Riabo drafted an offer letter, which Anderson forwarded to Cwik on May 29, 2013. The letter stated that Anderson was "confirming our offer to you to join First Stop Health (FSH) as a Project Manager reporting to the COO." DX 177 (attachment). The letter provided a list of responsibilities and included a start date of May 31, 2013, base pay of $76,000, equity options, participation in medical, dental, and disability insurance and a 401(k) program, and vacation in accordance with company policies.

Cwik continued to work for FSH through in or about March 2015, but he did not execute the offer letter. FSH continued to pay Cwik through the end of his tenure with the company on the same hourly basis ($40 per hour) as previously, and Cwik never

became eligible for company-provided health, dental, or disability insurance. He did receive a FSH account, in other words, he was given the ability to locate physicians online using FSH's services. Cwik also says that he was granted equity options, though FSH attributed this to a period during which, due to cash flow difficulties, it asked contractors to accept options in lieu of part of their compensation.

Cwik's pay for all the work he performed at FSH was reported on Internal Revenue Service form 1099, the type of form used for outside contractors, not on form W-2, which is used to report pay for employees. It does not appear that Social Security or income taxes were withheld from Cwik's pay. There is no evidence to suggest that Cwik objected to the absence of withholding or to the reporting of his income on a 1099 form rather than a W-2.

The evidence reflects that the only formal agreement that Cwik entered into with FSH is the independent contractor agreement that he signed in November 2012. Cwik contends that this agreement expired, was abandoned, or was superseded. He argues that the evidence shows that he did not actually perform the work contemplated by that agreement but rather operated in a different capacity under what amounted to a subsequent verbal arrangement that replaced the written independent contractor agreement.

FSH seems to acknowledge that the evidence shows that Cwik ended up working in different, or at least additional, roles from the one specifically contemplated at the time Cwik signed the November 2012 agreement. FSH nonetheless contends that all of the work was encompassed by, and performed under, the independent contractor agreement. In this regard, FSH relies on the provision of Schedule A to that

7

agreement stating that Cwik's duties as "[c]ontractor" included, but are "*not limited to*" those specifically identified. PX 19 (emphasis added). FSH contends, in substance, that the contract was broad enough to include any expansion of Cwik's duties decided upon after that date. It also points to the fact that McInturff's communication with Cwik in December 2012, just before Cwik came on board at FSH, made it clear that he would do as an independent contractor. FSH also relies on the January 2013 correspondence that discussed extending Cwik's contract and the May 2013 correspondence about bringing Cwik on as an employee. FSH argues that this and other evidence makes it clear that Cwik was not an employee as of that point in time, and it notes that Cwik declined to execute an agreement that would have formally made him an employee.

The Court noted earlier but repeats here that the issue before the Court is not whether Cwik performed his work as an independent contractor. Rather, the issue is whether the work underlying Cwik's claims in this lawsuit was performed pursuant to the November 2012 agreement. Thus if Cwik continued to work as an independent contractor but was not working under the November 2012 agreement, his claims are not subject to arbitration, because that agreement is the only source of a claimed obligation to arbitrate.

"Because arbitration is a matter of contract, 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). The question of whether a claim is subject to arbitration is largely a matter of contract interpretation. "If the contract is ambiguous, doubts concerning the scope of arbitrable issues should be resolved in favor of

8

arbitration." *Cty. of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 823 (7th Cir. 2006) (internal quotation marks omitted).

Cwik's argument that the agreement is ambiguous and that a clause entitled "Arbitration" stating that disputes will be settled in accordance with the rules of the American Arbitration Association" does not actually call for arbitration lacks merit. Paragraph 15 of the November 2012 agreement plainly requires arbitration of disputes arising from the agreement's terms or its interpretation.

FSH has shown by a preponderance of the evidence that Cwik's claims must be determined via the arbitration provision in the November 2012 agreement. The first, and simplest, reason for this is that the parties' dispute turns on interpretation of that agreement, specifically, whether the November 2012 agreement covers the work Cwik did for FSH from December 2012 through early 2015. Both sides have marshaled significant evidence in support of their respective positions on this point. FSH has, at a minimum, made out a colorable case that what happened was that the parties continued to operate under the November 2012 agreement even though it was originally meant to cover work different from what Cwik ultimately performed. Who has the better of this argument involves, in significant part, a matter of contract interpretation, and the arbitration provision says that the duty to arbitrate extends to any disputes arising out of the agreement's interpretation.[1] PX 17, ¶ 15.

Second, to the extent the Court needs to, and is permitted to, go beyond this in

---

[1] An arbitrator conceivably might determine that Cwik's work was not, in fact, performed under the November 2012 agreement. Such a determination presumably would require the dispute to be litigated in court, because at that point there would be no controlling arbitration requirement.

9

deciding the motion to compel arbitration, it concludes that FSH has shown by a preponderance of the evidence that the parties continued to operate under the November 2012 agreement during Cwik's term with FSH. Although FSH initially contemplated, when it decided to bring Cwik on to do work different from what it had anticipated, that a new independent contractor agreement would be executed, it did not do that and brought him on anyway, and then discussed with Cwik a month later "extend[ing] [his] contract," which is evidence that the parties were continuing to operate under the only "contract" they had signed. And there was later discussion about, and an offer to, convert Cwik to employee status, a further indication that the parties were up to that point continuing to operate under the prior signed agreement. Cwik turned down the employee agreement but kept working for FSH, a further indication that the same written agreement remained in place.

The Court does not decide here whether Cwik was, legally speaking, truly an independent contractor or instead an employee that FSH was misclassifying as an outside contractor. But the evidence shows that Cwik was paid the same flat hourly fee agreed to in the November 2012 agreement; he supported his pay with invoices / time sheets that he periodically submitted as that agreement contemplated; and as set forth in that agreement, he did not participate in health insurance or pension benefits offered to FSH employees. The evidence does reflect that he was offered equity options, but this and the other evidence Cwik cites is insufficient to outweigh the evidence cited by FSH.

All of this, together with the evidence previously cited, reflects that FSH and Cwik continued throughout his tenure with the firm to operate under the November 2012

10

agreement. That agreement requires arbitration of disputes arising from its terms or from its interpretation. This arbitration requirement is broad enough to cover Cwik's claims in this case. More specifically, Cwik's FLSA claims turn on whether he was properly classified by FSH as an independent contractor, a classification that appears in the November 2012 agreement, and the nature and amount of his compensation (including the offered equity options), which is also addressed in the November 2012 agreement. When parties have an arbitration agreement and the claims asserted in a lawsuit are within its scope, a court cannot properly deny a motion to compel arbitration. *See, e.g., Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004).

## Conclusion

For the reasons stated above, the Court concludes that FSH has shown that Cwik's claims must be submitted to arbitration. The Court therefore grants FSH's motion to compel arbitration and stays the case pending the conclusion of arbitration proceedings. In the interim, the Court will administratively terminate the case as a pending matter. The status hearing and ruling set for April 11, 2016 is vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 10, 2016